# IN THE U.S. DISTRICT COURT
# FOR THE MIDDLE DISTRICT
# OF ALABAMA
# NORTHERN DIVISION

| | | |
|---|---|---|
| **NORRIS W. GREEN,** | ◊ | |
| | ◊ | |
| Plaintiff, | ◊ | |
| | ◊ | |
| **STATE BOARD OF MEDICAL** | ◊ | |
| **EXAMINERS**, and each individual | ◊ | |
| board member, including former board | ◊ | |
| members, who were involved in the | ◊ | **CIVIL ACTION NO.** |
| actions of the Board of Medical | ◊ | |
| Examiners on September 20, 2017, and | ◊ | |
| prior thereto, and the **BOARD OF** | ◊ | **2:18-CV-00719-TFM** |
| **CENSORS OF THE MEDICAL** | ◊ | |
| **ASSOCIATION OF ALABAMA**, and | ◊ | |
| **THE MEDICAL ASSOCIATION OF** | ◊ | **DEMAND FOR JURY TRIAL** |
| **ALABAMA,** and each individual board | ◊ | |
| member, including former board | ◊ | |
| members, who were involved in the | ◊ | |
| actions of the Board of Censors on | ◊ | |
| September 20, 2017, and prior thereto, | ◊ | |
| namely,  **Boyde Jerome Harrison, MD,** | ◊ | **CONSTITUTIONALITY OF CODE** |
| **H. Joseph Falgout, MD, Mark H.** | ◊ | **OF ALABAMA §34-24-53** |
| **LeQuire, MD, Gregory W. Ayers M.D.,** | ◊ | **CHALLENGED** |
| **Eli L. Brown M.D., David P. Herrick** | ◊ | |
| **M.D., Beverly F. Jordan M.D. ,Gary F.** | ◊ | |
| **Leung M.D., John S. Meigs Jr. M.D.,** | ◊ | |
| **Dick Owens M.D., Bradley S. Rice** | ◊ | |
| **M.D., Charles M.A. Rogers IV M.D.,** | ◊ | |
| **and State Board of Medical Examiners** | ◊ | |
| **Staff Attorneys, Patricia Shaner**, and | ◊ | |
| **Eric Wilson Hunter.** | ◊ | |
| | ◊ | |
| Defendants. | | |

# FIRST AMENDED COMPLAINT
# FOR
# $10,000,000.00
# COMPENSATORY AND PUNITIVE DAMAGES

**AND**
**ADDITIONAL 42 USC 1983 COMPENSATORY**
**AND PUNITIVE DAMAGES**
**AND FOR**
**DECLARATORY AND INJUNCTIVE RELIEF**

This Complaint is amended  by (1)  inserting a statement under **Cause of Action IV** to plead there is no adequate state remedy for redressing the wrongs committed, at Page 48, and (2) by adding a claim for attorneys fees, costs and expenses to **Cause of Action V** at Page 51.

## STATEMENT OF THE CASE

This is a civil action brought by the former Executive Director of the State Board of Medical Examiners, as Plaintiff, against the State Board of Medical Examiners (hereinafter interchangeably ABME or State Board of Medical Examiners), and the Medical Association of Alabama, acting by and through it's Board of Censors, (hereinafter interchangeably MASA or Board of Censors) including certain of their (ABME and MASA) individual Board members, and former Board members, and certain staff employees who collectively and actively engaged in a conspiracy to egregiously, maliciously**,** tortiously, and wrongly caused the forced and constructive dismissal of the Plaintiff from his position as Executive Director on September 20, 2017, and in the course of doing so the State Board of Medical Examiners, acting by and through certain of its members violated Plaintiff's right to fundamental procedural due process guaranteed under the 14th Amendment to the U. S. Constitution.

## JURISDICTIONAL STATEMENT

This civil action is filed under multiple state and federal causes of action, principally, 42 U.S.C §1983, and §1988, and pursuant to the test adopted in **Vanover v. NCO Financial Services, Inc.**, **857 F. 3D 833** (11th Circuit 2017), and **Wyles v. Sussman, 661 Fed. Appx. 548,** (10th Circuit 2016).


# IMMUNITY

The State Board of Medical Examiners does not qualify as a beneficiary of sovereign immunity under Section 14 of the Alabama Constitution of 1901 and neither its Board members nor staff employees are entitled to sovereign or qualified immunity from this civil action. The State Board of Medical Examiners possesses none of the customary attributes of a state agency. The ABME staff employees are not under the Alabama Merit System. ABME Board members and staff employees are not under the State of Alabama personnel department. ABME staff employees are not under State of Alabama retirement system. ABME staff employees are not under the State of Alabama employees health insurance system.

ABME staff employees are not under the State of Alabama deferred compensation system. ABME staff employees have their own designated state holidays, many different from all other state employees and fewer than state employees. ABME staff employees have different leave accumulation than state employees, less generous. ABME Board members and staff employees do not expend money from the state treasury and the state treasury is not exposed to ABME liabilities. ABME Board members and staff employees are not subject to any controls in accounting and payroll. All state agencies are under state comptroller directives and accounting.

ABME funds are separate from the funds of the Alabama state treasury.  ABME has its own disability and life insurance policies apart from the State of Alabama.  ABME claims it is not under the Alabama Ethics Law as further evidence of its non-participation as a state agency. The State of Alabama makes no appropriation of tax revenue or treasury funds to ABME.  Even among the few state boards whose funds are earmarked only for that board and for which the legislature still appropriates annually to them, in each of those instances, the Alabama Legislature retains control of that board's level of funding, but not ABME's.  Many state boards can retain a balance up to a specific level with any excess funds going into the state general fund. ABME does not and is not required to give up any of their funds to the state and spends it out of an ABME checking account with no accountability to anyone to spend money as the board directs.  There is also no appropriation from the State of Alabama or from any other state source of funds flowing to ABME.

All but a few state boards are funded solely through the state treasury and even though funds are earmarked only for those boards, the legislature still appropriates annually to them. The Legislature controls the level of funding for those boards, but not ABME. ABME does not use the state motor pool for the transportation needs of Board members and staff employees.

Board members of ABME are not appointed by state officials.  A private trade organization, the Medical Association of Alabama, drafts its own constitution without state oversight, and decides who qualifies for its private Board of Censors, who the Code of Alabama then allows to automatically become members of the ABME. All elections to become a member of the State Board of Medical Examiners are privately conducted by and for the Medical Association of Alabama without any state oversight.  There is no financial or administrative accountability by the Alabama Medical Association or the State Board of Medical Examiners to

the State of Alabama.  Perhaps the most significant fact which defies an immunity argument is ABME is authorized to maintain its own security fund and secure millions of dollars in liability insurance coverage for each board member and staff employee, which has been done, to provide a financial source from which to pay liability claims as set forth herein. Any recovery under this civil action will be paid through the Risk Management Department out of the General Liability Trust Fund and/or the security fund established under Code of Alabama §34-24-53, not the State Treasury.

This litigation will not significantly hamper or interfere with the business of the State Board of Medical Examiners.

Finally, for purposes of this civil action and for many of the events of September 20, 2017, ABME lost any immunity it may claim it has by illegally conducting the business of AMBE before the Board of Censors, a private arm of the Medical Association of Alabama, a private trade organization.

## PARTIES

(1)     Plaintiff, Norris W. Green, (hereinafter Plaintiff) is resident of Montgomery County, who served in the Alabama Legislative Fiscal Office from 1976 until 2015, departing in July 2015 while serving as the full-time Director of the Legislative Fiscal Office to accept a position as Associate Executive Director of the State Board of Medical Examiners.  In January 2017, Plaintiff was unanimously elected to become full-time Executive Director of the State Board of Medical Examiners.

(2)     Defendant, the State Board of Medical Examiners is an organization  located in Montgomery, Alabama.

(3)     Defendant, Boyde "Jerry" Harrison, M.D, (hereinafter Defendant Harrison) was formerly President of the Medical Association of Alabama and a member of the Board of Censors of the Medical Association of Alabama, and held that Board membership position as President of the Medical Association of Alabama, until he resigned on August 15, 2017.  At the time Defendant Harrison resigned, the following named medical doctors were serving as officers of the Medical Association of Alabama which according to the By-Laws of the Medical Association of Alabama, entitled each of them to serve on the Board of Censors of the Medical Association of Alabama and by state statute on the State Board of Medical Examiners, namely, Jefferson Underwood III, MD, was at the time serving as President Elect of the Medical Association of Alabama, David P. Herrick, MD was serving as Past President of the Medical Association of Alabama, and Ronnie Lewis, MD (deceased) was serving as Vice-President of the Medical Association of Alabama.   Jefferson Underwood III, MD became President of the Medical Association of Alabama on August 15, 2017, and his former position as President-Elect would remain vacant for the next eight (8) months as required by the By-Laws of the Medical Association of Alabama which clearly state that a vacancy in the office of President-Elect will remain unfilled until the next annual meeting of the Medical Association of Alabama (which occurred on April 12, 2018).  Based upon the foregoing facts, during the time of the events surrounding the forced dismissal of the Plaintiff, Defendant Harrison was not a member of the Board of Censors of the Medical Association of Alabama and was therefore not a member of the State Board of Medical Examiners, and consequently all of his emails, text messages, personal conversations, telephone calls, comments, opinions, board discussions and board deliberations transmitted and/or made between August 15, 2017 and April 12, 2018, concerning the Plaintiff were made by Defendant Harrison as a private citizen, and all votes he submitted at all board

meetings he participated in on September 20, 2017 are void and a nullity.  Furthermore, at all times covered in this complaint, Defendant Harrison was not serving in any capacity that entitles him to invoke qualified or limited immunity under the Constitution of Alabama. Defendant Harrison is believed to be the principal incognito architect of the malicious conspiracy to oust the Plaintiff from his position as Executive Director of the State Board of Medical Examiners, during the time when Defendant Harrison was a private citizen with no right to be involved in the proceedings and business of the Board of Censors and with no right to be involved in the proceedings and business of the State Board of Medical Examiners.  Notwithstanding ABME's lack of immunity, Defendant Harrison is not entitled to any immunity because during the time covered by this complaint Defendant Harrison was not as an employee, officer or board member of the State Board of Medical Examiners, and was therefore a complete stranger to any employment relationship with the Plaintiff on September 20, 2017 and the events leading up to the constructive dismissal of the Plaintiff on that date.

Defendant Harrison is also believed to be the principal architect, acting directly and indirectly through others, of broadcasting malicious and defamatory statements about the Plaintiff which transpired on and before September 20, 2017 at the Board of Censors of the Medical Association of Alabama, the illegal Executive Session of the Board of Censors, and the illegal Executive Session of the State Board of Medical Examiners, when he had no right to attend, had no right to vote, had no right to express an opinion, and possessed no authority to participate in and/or mastermind the efforts to oust the Plaintiff.

(4)     Defendant, Patricia Shaner, (hereinafter Defendant Shaner) is a resident of Montgomery County, who served as an employee of the State Board of Medical Examiners and continues to serve.  Defendant Shaner was serving as one of three staff attorneys during the

weeks leading up to the constructive dismissal of the Plaintiff including the date of the constructive dismissal of the Plaintiff, however, on more than one occasion during the course of events leading up to the constructive dismissal of the Plaintiff, Defendant Shaner clearly acted with malice outside the line and scope of Defendant Shaner's job including the communication of defamatory statements and engaging in discussions about such statements and other fabricated accusations with Board members, and former Board members, and strangers leading to the constructive dismissal of the Plaintiff.

(5)     Defendant, Eric Wilson Hunter (hereinafter Defendant Hunter) is believed to be a resident of Jefferson County, Alabama who serves as an employee of the State Board of Medical Examiners.  Defendant Hunter was serving as one of three staff attorneys during the weeks leading up to the constructive dismissal of the Plaintiff including the date of the constructive dismissal of the Plaintiff, however, on more than one occasion during the course of events leading up to the constructive dismissal of the Plaintiff, Defendant Hunter acted with malice outside the line and scope of his job by talking to Board members, former Board members, employees, and strangers who were also acting with malice outside the line and scope of their employment including the propagation and fabrication of untrue and defamatory rumors which were the proximate cause of Plaintiff's constructive dismissal.

(6)     Defendant, Medical Association of Alabama, (hereinafter Defendant MASA) acting by and through its Board of Censors, and through the members of its staff, and who has its principal offices in the City of Montgomery, Montgomery County, Alabama, did on September 20, 2017, engaged in discussions and deliberations involving false and malicious allegations against the Plaintiff, over whom the Medical Association of Alabama had absolutely no right to discuss, no right to violate the privacy of the Plaintiff, and no right to receive the reports or

statements of Board members, or former Board members, or staff persons concerning the Plaintiff, and by doing so intentionally and maliciously interfered with the employment of the Plaintiff, defamed the Plaintiff, and violated the Plaintiff's right of privacy.

(7)     Defendant, State Board of Medical Examiners, has its principal offices in the City of Montgomery, Montgomery County, Alabama, and on September 20, 2017, engaged in discussions and deliberations involving false and malicious allegations against the Plaintiff, over whom the State Board of Medical Examiners had absolutely no right to promote without an investigation, no right to violate the privacy of the Plaintiff, and no right to receive the unsubstantiated reports or statements of Board members, or former Board members, or staff persons concerning the Plaintiff without due process protections.  Because there was wanton and malicious absence of procedural due process governing the meeting and because of the intentional, grossly negligent, and flagrant violations of the Alabama Open Meetings Law, the meeting was void and should have never been conducted or acted upon; and, because the Board members, and former Board members, of the State Board of Medical Examiners already identified by name conducted the meeting for the sole purpose of dismissing the Plaintiff, those members did intentionally and maliciously interfere with and breached the employment rights of the Plaintiff, defamed the Plaintiff, violated the Plaintiff's right of privacy, and violated Plaintiff's right to U. S. Constitutional procedural due process.

(8)     Defendants Dr. H. Joseph Falgout, MD, Dr. Mark H. LeQuire, MD, Gregory W. Ayers M.D., Eli L. Brown M.D., David P. Herrick M.D., Beverly F. Jordan M.D. ,Gary F. Leung M.D., John S. Meigs Jr. M.D., Dick Owens M.D., Bradley S. Rice M.D., Charles M.A. Rogers IV M.D., are believed to all be  members of the State Board of Medical Examiners who actively participated in the constructive dismissal of the Plaintiff, further identified as those who engaged

in deliberations and/or discussions on September 20, 2017, in support of the Plaintiff's dismissal including non-Board members, who passed along and publicized verbally, false, fictitious and/or intentionally fabricated rumors, in the presence of staff of the Medical Association of Alabama, and in the presence of strangers inside and outside those meetings to third parties.  Some of these Board members are expected to claim they are innocent and passive bystanders, who simply blindly followed the direction dictated by their assumed leader, Dr. Boyde Jerome Harrison, MD.  How strange it must be to suddenly discover Defendant Harrison was not even a board member.

## FACTUAL ALLEGATIONS

(1)      In 1907 the State of Alabama created the State Board of Medical Examiners thereby shifting the regulatory authority of licensing the practice of medicine from county governance to state governance.   The Medical Association of Alabama has existed as a professional trade organization in one form or another since 1848.

(2)      The Board of Censors of the Medical Association of Alabama was constituted the State Board of Medical Examiners by act of the Alabama Legislature in 1911, Code of Alabama 1940 Title 46 §258 presently codified §34-24-53.

(3)      The Medical Association of Alabama is a private professional trade organization, who adopts its own constitution and by-laws setting out how the 16 members of its Board of Censors are elected, thereby simultaneously deciding who is entitled to serve on the 16 member State Board of Medical Examiners.   In other words, a completely private group of medical

doctors, independent of any public input, decides on its own, who will serve on a state board charged with looking after the quality and competency of the medical community serving the people of Alabama.

(4)     In 1985, The State of Alabama created the State Committee of Public Health composed of the same twelve members of the Board of Censors of MASA, plus four more members from the four councils listed in Code of Alabama §22-2-4, comprising a total of sixteen Board members.

(5)     The sixteen members of the State Committee of Public Health have the authority to appoint an executive officer with the title of State Health Officer, and set his term of office and salary, however, all salaries of employees of the State Committee of Public Health are subject to approval by the State Personnel Board. Code of Alabama §22-2-8.

(6)     In 1981, Alabama created a Medical Licensure Commission consisting of seven physicians and one non-physician consumer, appointed by the Governor, Lt. Governor, and Speaker of the House, said commission has been given the exclusive authority to issue, revoke and reinstate all licenses to practice medicine in Alabama, and while not bound by the recommendations of the State Board of Medical Examiners, the Medical Licensure Commission is required to receive their reports, and give their reports and recommendations fair consideration.  Thereafter, they may issue, revoke, deny revocation, or reinstate the license to practice medicine in Alabama.  The primary purpose of the State Board of Medical Examiners is to issue recommendations regarding certificates of qualification (COQ) and investigate anyone practicing medicine without a license and to regulate physicians to insure they are engaged in the competent practice of medicine for the protection of the people of Alabama. The Executive Director of the State Board of Medical Examiners operates an office of over 35 employees

including as many as three attorneys and six full time investigators who present their findings to the Board of Medical Examiners on a monthly basis.   Recommendations regarding medical licensure are forwarded to the Medical Licensure Commission.

(7)     When the Plaintiff was originally approached by the Executive Director of the State Board of Medical Examiners about coming to work for the State Board of Medical Examiners, the stated plan according to the Executive Director, was for Plaintiff to work for four (4) years, two (2) years under the current Executive Director as Associate Executive Director, then the current Executive Director would retire after those two (2) years and George (Buddy) Smith, Jr., MD would be appointed Executive Director of State Board of Medical Examiners, but for those two years George (Buddy) Smith, Jr., MD would only work (2) days per week at the State Board of Medical Examiners because George (Buddy) Smith, Jr., MD's presence was needed at his personal medical practice three days a week.  The stated plan was for the Plaintiff to run the day to day operations of the State Board of Medical Examiners for those two additional years as Associate Executive Director while Dr. Smith held the title as Executive Director.   The State Board of Medical Examiners Executive Director asked Plaintiff for a minimum four (4) year commitment in order for the Board to be able to carry out the proposed plan for the Executive Director's replacement. Plaintiff was also told by the Executive Director that when State Board of Medical Examiners membership changed (as it did in April 2016) George (Buddy) Smith, Jr., MD might not be elected as Executive Director, and the State Board of Medical Examiners might decide to give the position of Executive Director to the Plaintiff, which is exactly what happened.

(8)     Plaintiff agreed to the minimum four (4) year commitment after his final meeting with the Executive Director and after going over all salary and benefits that the Plaintiff would

receive, specifically the retirement and deferred compensation that would accrue over the four-year period, Plaintiff was offered the same pension plan, deferred compensation, State Board of Medical Examiners funded health insurance, life insurance and liberal leave policy that the currently serving Executive Director had enjoyed as the Executive Director of the State Board of Medical Examiners since 1981.  The State Board of Medical Examiners has a retirement system separate and distinct from the state retirement system.

(9)     Plaintiff notified the Senatorial leadership of the Legislative Fiscal Office that Plaintiff planned to leave prior to the start of the 2015 regular session of the State Legislature. The Senatorial leadership wanted the Plaintiff to remain to help them through the end of the 2015 session of the State Legislature and asked Plaintiff if they could contact the State Board of Medical Examiners.  The contact was made and the Executive Director was asked if the offer to Plaintiff could be held open until the end of the 2015 legislative session because the State Legislature needed Plaintiff's' expertise to help navigate through that legislation session.  The Executive Director, Senatorial leadership and Plaintiff agreed and the proposal was presented to the State Board of Medical Examiners for approval.  Plaintiff attended the meeting where the State Board of Medical Examiners approved Plaintiff being hired for four years to commence at the conclusion of the 2015 regular session of the State Legislature.   The Board clearly understood Plaintiff had made a four (4) year commitment to them.  However, most Board members were not aware of Defendant Harrison-Smith proposed plan at the time, a plan designed to allow George (Buddy) Smith, Jr., MD to eventually acquire the title of Executive Director after two years while the Plaintiff managed the office during George (Buddy) Smith, Jr.'s tenure. The State Board of Medical Examiners board leadership at the time Plaintiff was hired in 2015 was Defendant Harrison as Chairman and H. Joseph Falgout, MD as Vice

Chairman. George (Buddy) Smith, Jr., MD was a board member who would remain on the board another year as Past President of the Medical Association of Alabama, then rotate off the board.

(10)    The State Board of Medical Examiners board leadership changed in April 2016. H. Joseph Falgout, MD, a Tuscaloosa surgeon became board chairman and Mark H. LeQuire, MD, a Montgomery radiologist, became Board Vice Chairman. Mark H. LeQuire, MD was at the time Plaintiff's biggest supporter, they became good friends, he was believed to be a reliable person, and Plaintiff had always believed he was honest and sincere. After being selected as Executive Director in January 2017, Plaintiff and Mark H. LeQuire, MD began the practice of the Executive Director and board vice-chairman meeting the week prior to each monthly board meeting to discuss issues of concern for the upcoming meeting. Plaintiff and Mark H. LeQuire, MD and their wives socialized together.  Plaintiff and Mark H. LeQuire, MD often talked about all of the problems and abuses within the State Board of Medical Examiners, and how laws and regulations were being ignored.  On more than one occasion in the presence of Plaintiff's wife and Mark H. LeQuire's wife, Mark H. LeQuire stated that the former Executive Director knew exactly what he was doing when he hired Plaintiff to come work at the State Board of Medical Examiners; and on those same occasions, Mark H. LeQuire MD said the former Executive Director knew Plaintiff would straighten out all of the problems that Plaintiff and Mark H. LeQuire MD had been discussing, and Mark H. LeQuire MD was dead serious when he made those statements in the presence of their wives.  State Examiners conduct a financial audit every two years and make a very general review of operational issues, the last audit was in 2015.  Prior to the time the Plaintiff was constructively dismissed, it was generally communicated by the Examiners that the State Board of Medical Examiners was significantly deficient in documentation of their expenditures, especially concerning contracts with the

Medical Association of Alabama.  The supervisor of the state examiner who was retiring after 2017 told the Plaintiff that the next supervisor would not understand how the State Board of Medical Examiners is run and that the State Board of Medical Examiners needs to straighten up.

(11)    As the end of 2016 was coming to a close, Plaintiff was gaining knowledge of the inner workings of the office and it became apparent to the Plaintiff that the new board leadership did not want George (Buddy) Smith, Jr., MD as their new Executive Director and instead wanted someone else to replace the retiring Executive Director. In mid 2016, the Credentials Committee of the State Board of Medical Examiners voted to conduct a search for an Executive Director but a search was never conducted.  Mark H. LeQuire, MD, working with the Credentials committee, eventually recommended Plaintiff to the State Board of Medical Examiners who "formally" and unanimously approved him, however, according to Mark H. LeQuire, MD behind the scenes, George (Buddy) Smith, Jr., MD's group as supported by Defendant Harrison could only muster seven (7) votes against Plaintiff, while the other nine (9) Board members supported the Plaintiff. The only non-physician Executive Director ever hired by the State Board of Medical Examiners retired on January 1, 2017, and the plan for George (Buddy) Smith, Jr., MD to succeed the retiring Executive Director was effectively abandoned.

(12)    When the Executive Director finally retired on January 1, 2017, he had already told the Plaintiff that the Plaintiff should not have to deal with some of the problems left behind at the State Board of Medical Examiners.  Plaintiff quickly discovered there is a culture of self indulgence, and aside from a few honorable Board members, many believe they are entitled to more than authorized by controlling state statutes and board regulations.  Because the Medical Association of Alabama controls the rotation on the State Board of Medical Examiners, many are kept on the board in an almost perpetual arrangement based on their willingness to support

the Medical Association agenda.  H. Joseph Falgout, MD and Mark H. LeQuire, MD told the Plaintiff upon his selection as Executive Director, you run the agency legally and ethically and we will handle the medical issues.

(13)    Plaintiff received a 10% raise over what he was making as Associate Director when he was elevated to the title of  Executive Director.  In July 2017, two months before Plaintiff was constructively dismissed, Plaintiff received a 20% raise.  H. Joseph Falgout, MD and Mark H. LeQuire, MD approved the salary, and H. Joseph Falgout, MD and Mark H. LeQuire, MD both told the Plaintiff at that time that "you earned it, and we will get there together."

(14)    The State Board of Medical Examiners has four (4) contracts with the Medical Association of Alabama in excess of $1,300,000.00 annually.  Two contracts are to provide programs for continuing education for medical doctors.  State Board of Medical Examiners leases it offices from the Medical Association of Alabama, who is a landlord heavily involved in politics.  Mark Jackson was a former lobbyist and is currently Executive Director of the Medical Association of Alabama. Prior to the Plaintiff's arrival, Mark Jackson was paid as a lobbyist by State Board of Medical Examiners but when promoted to Executive Director of the Medical Association of Alabama, Mark Jackson continued to have a contract with State Board of Medical Examiners even though he was the full time Executive Director of the Medical Association. Effective October 1, 2017, to the credit of Mark Jackson's ethics and honesty, Plaintiff and Mark Jackson reached an agreement that Mark Jackson would no longer receive his contract payment from the State Board of Medical Examiners

(15).    The State Board of Medical Examiners pays over $475,000 annually to the Medical Association of Alabama to sponsor CME courses for medical doctors to earn their

required continuing medical education.  This large amount of money is to cover the cost of sponsoring seminars throughout the year, including all customary costs for hiring speakers for the seminars.  The primary cost of sponsoring and conducting any seminar is typically the cost of speakers, however, when medical doctors serving on the Board of Medical Examiners serve as speakers at CME seminars sponsored by the Medical Association of Alabama, those doctors received payment from the State Board of Medical Examiners for their speakers fee at the rate of $300 per hour for time spent at the seminar, not just for time speaking. A two day seminar often nets these State Board of Medical Examiners board member/speakers over $4,800.00. The Medical Association of Alabama charges fees for the seminars paid by medical doctors to attend when those seminars have already been heavily funded by the State Board of Medical Examiners to sponsor the programs yet the State Board of Medical Examiners member-speakers are already being improperly paid by the State Board of Medical Examiners ostensibly in compliance with state statutes and accompanying regulations, however those statues clearly limit the $300 hourly rate for expert medical review of cases that may need to be brought before the Medical Licensure Commission or cases requiring the imposition of disciplinary action by the State Board of Medical Examiners.

(16)    The Code of Alabama governs the meeting fees and consulting fees applicable to the members of the State Board of Medical Examiners, who are entitled to received $300 for attendance at each monthly board meeting or designated board function, and also provides that medical doctors who review records as part of their investigative duties on the ABME board are to be compensated at the rate of $300 per hour, but based an intentional and convenient misinterpretation of the applicable statutory law, Board members on the State Board of Medical Examiners bill and receive $300 per hour for activities clearly not contemplated in the statute

and also are paid $300 per day for attending functions that are clearly not directly or even remotely related to the statutory duties of the State Board of Medical Examiners including  travel expenses plus $300 for showing up at various events unrelated to their duties as members of the State Board of Medical Examiners.  Perhaps one of the greatest financial abuses within the State Board of Medical Examiners has been providing certain Board members with reimbursement of up to $10,000.00 per year to cover the cost of their annual CME requirements.  Nowhere does the Code of Alabama authorize Board members of the State Board of Medical Examiners to award themselves up to $10,000.00 reimbursement for seminars and travel and payments associated with attending CME seminars, ostensibly to earn CME hours, when almost every medical doctor in the State of Alabama has to cover their own CME costs, and also pay fees to the Board of Medical Examiners for the renewal of their medical license, only to discover some of their hard earned cash is being doled out to a few select medical physicians on the ABME board for CME, which is not a requirement or a statutorily allowed expense of the Board of Medical Examiners.

(17)    Plaintiff in consultation with the board leadership in August 2017, one month before Plaintiff was constructively dismissed, proposed that the State Board of Medical Examiners stop paying the lucrative consulting fees that some board member physicians  were charging State Board of Medical Examiners and to not allow CME reimbursement unless the meeting was clearly an integral part of the business of the State Board of Medical Examiners (in other words CME was not the primary focus of the meeting).

(18)    There was an State Board of Medical Examiners retreat scheduled for October 2017 where leadership asked the Plaintiff to go over the changes in travel reimbursement as part of new board member orientation, concerning the proposal to no longer pay Board members for

Medical Association of Alabama related activities, only statutorily defined State Board of Medical Examiners related activities. This was an area that had historically been grossly abused by a few State Board of Medical Examiners Board members who were also Medical Association of Alabama delegates. This was one of many motivating factors impacting the timing of the effort to force the Plaintiff out of his job in September 2017, only three weeks before he could make his presentation at the October 2017 retreat.

(19)    Plaintiff recommended that the State Board of Medical Examiners stop paying the standard $300 per diem for attending any meeting unless the board approved it or unless it was clearly an State Board of Medical Examiners function.  Defendant Harrison and others would routinely go to a meeting in another town having nothing to do with State Board of Medical Examiners, and receive $300 for attending. The board never formally adopted a rule to stop paying it, but board leadership tentatively agreed for Plaintiff to implement it in 2017. This was one of many changes discussed in informal meetings with State Board of Medical Examiners leadership and Defendant Harrison, that was promptly abandoned upon constructive dismissal of the Plaintiff.

(20)    Most of these proposed changes to bring the State Board of Medical Examiners within the state statutes were unacceptable to Defendant Harrison who had every reason to look for any excuse to remove the Plaintiff from his position as Executive Director and thus quietly behind the scenes the conspiracy was hatched to bring about Plaintiff's constructive dismissal.

(21)    Defendant Shaner is the longest serving member of the small legal staff at State Board of Medical Examiners.  Defendant Shaner and Plaintiff always had a professional working relationship during Plaintiff's tenure as Associate Executive Director and as Executive Director until Defendant Shaner realized she might be able to bring about the Plaintiff's downfall

working with others.  The main function of the legal staff at State Board of Medical Examiners is to investigate and prosecute cases before the Alabama Medical Licensure Commission. However, over 10 years ago, Defendant Shaner, who at the time was only one of two lawyers in the legal division of Alabama Board of Medical Examiner, asked for permission from the former Executive Director and received permission to stop handling cases before the Licensure Commission.  The main reason lawyers are hired to work for State Board of Medical Examiners is to prepare and prosecute cases before the Medical Licensure Commission.  Defendant Shaner is one of the highest paid lawyers in state government, and for the past ten (10) years Defendant Shaner has been exempted from performing the job she was primarily hired to do.  Defendant Shaner told someone in 2015, that if the Plaintiff was hired as Associate Executive Director for a salary higher than Defendant Shaner's $200,000.00 plus annual salary, she was going to the sue the State Board of Medical Examiners, one of several threats that became the pattern and practice of Defendant Shaner prior to Plaintiff's dismissal.  Completely contrary to the job description she wrote for herself, and completely contrary to the State Board of Medical Examiners Employee Manual, Defendant Shaner repeatedly insisted that she was not answerable to the Executive Director (even though she knew she had to obtain permission from the former Executive Director to radically change her job status).  Defendant Shaner never accepted the Plaintiff as her boss, and when Defendant Shaner continued repeating that insubordinate statement to the Plaintiff, Defendant Shaner was repeatedly told she was wrong, and the Plaintiff eventually reported Defendant's insubordination to the State Board of Medical Examiners board leadership which decided the messenger should be dismissed, not the insubordinate employee.

(22)    As a direct consequence of Defendant Shaner not doing the job Defendant Shaner was hired to perform, the State Board of Medical Examiners had to expand the use of expensive

independent outside counsel to handle cases before the Medical Licensure Commission.  The former Executive Director in consultation with the Plaintiff, hired Defendant Hunter from the US Attorney's Office in Birmingham, but the expensive use of outside counsel continued, with at least two Montgomery lawyers each generating enormous fees annually in billable payments from the State Board of Medical Examiners, while the State Board of Medical Examiners continued to pay over $200,000.00 dollars annually to Defendant Shaner, to supervise herself and Defendant Shaner's two lawyer legal division.

(23)     When Plaintiff was originally hired as Associate Executive Director he suggested to the Executive Director that the Board of Medical Examiners should reduce using expensive outside counsel.  Shortly thereafter, a highly competent lawyer who worked in the Legislative Fiscal Office was asked to come to work in the legal division of State Board of Medical Examiners to eventually handle cases and help avoid the expense of outside counsel as well as use the new attorney's regulatory expertise to assist the staff with legal issues concerning licensing, interstate compacts as well as governing issues concerning the Board.  Plaintiff has reason to believe that at least one of the two principal Montgomery lawyers serving as outside counsel, joined the effort to get rid of Plaintiff along with the efforts of Defendant Shaner and Defendant Hunter, who never liked the new attorney and who saw the new attorney as a threat to their own job security, notwithstanding that the new attorney was an excellent administrator and very knowledgeable about state government, regulatory issues, and came to the State Board of Medical Examiners with the understanding that Defendant Shaner would help the new attorney learn the role of prosecutor before the Licensure Commission.  It turned out that the new attorney was far more accomplished in her areas of expertise than those serving in the legal division of State Board of Medical Examiners, so within a month of the Plaintiff being

wrongfully terminated, the new attorney resigned.  Interestingly, during the decades that Defendant Shaner worked as an attorney in the legal division and later as chief counsel, at no time did Defendant Shaner ever make any recommendation to anyone that the Board members were operating outside existing laws and regulations, while all that time erroneously claiming she only reported to the board.

(24)     The Plaintiff as Associate Executive Director and later as Executive Director wanted to bring the bulk of the legal work back to State Board of Medical Examiners.  The new attorney was fitting in nicely and almost everyone liked the new attorney until someone started a false rumor that the new attorney was going to replace Defendant Shaner as general counsel when Defendant Shaner retired in the next couple of years. At no time until the day Plaintiff was forced out did anyone in the leadership of the State Board of Medical Examiners or within the legal division say anything to the Plaintiff about there being a problem in the legal division, and neither the Plaintiff nor anyone in leadership ever told Defendant Hunter or Defendant Shaner that the new attorney was going to replace Defendant Shaner.

(25)     Historically everyone on staff at State Board of Medical Examiners received a raise every August beginning decades ago.  There was no merit system, there were no evaluations, all staff automatically received a raise each year, which has resulted in many people in the office being highly paid for their job duties compared to other similarly situated state employees.  The Plaintiff told the board that automatic raises needed to stop and a normal evaluation process instituted.  The Plaintiff received permission and developed an evaluation form based upon the form used at the Legislative Fiscal Office.  The Plaintiff conducted his first informal evaluation in August 2017, a month before he was forced out.  Defendant Shaner refused to participate in the evaluation plan developed by her boss (Plaintiff) for all supervisors,

and came up with Defendant Shaner's own evaluation form for Defendant Shaner's legal division consisting of herself, Defendant Hunter, the new attorney, one paralegal and one secretary.  All thirty-seven (37) employees in the office participated in the evaluation plan developed by the Plaintiff.  Defendant Shaner submitted a very favorable review of one of the two lawyers within Defendant Shaner's department, namely, Defendant Hunter. The Plaintiff thereafter interviewed Defendant Hunter after receiving Defendant Shaner's own personal supervisory evaluation form, and had a pleasant and productive conversation with Defendant Hunter.  At the time, the Plaintiff assured Defendant Hunter that Defendant Hunter would eventually replace Defendant Shaner, as General Counsel, when Defendant Shaner retired. Defendant Hunter thanked the Plaintiff for staying out of the business of the legal division, a comment which at the time that defied a rational explanation.

(26)    Defendant Shaner evaluated the new attorney and noted the new attorney lacked prosecutorial skills, which was surprising because it was Defendant Shaner's direct responsibility to train the new attorney in that area of practice, and until that point in time, Defendant Shaner had refused to train or mentor the new attorney.  Defendant Shaner from the outset had stopped having almost anything to do with the new attorney, even though the new attorney was under Defendant Shaner, who served as senior attorney in the legal division of the State Board of Medical Examiners.  Defendant Hunter also had little to do with the new attorney and unreasonably feared that new attorney was going to take the General Counsel's job from him.  A week or two later, the State Board of Medical Examiners would be deliberating the removal of the Plaintiff because of something at least one board member labeled a toxic working environment, which was all created, manufactured, and fabricated by Defendant Shaner and Defendant Hunter in the legal division, who falsely spread the word that the legal division was in

shambles, a condition manufactured by Defendant staff attorneys repeatedly reporting false accusations to Board members who didn't want to deal with such salacious and troublesome allegations, preferring instead to terminate the employment of the one being complained about without conducting any formal investigation to determine the truth of any allegations and without providing the dismissed Executive Director with basic and fundamental procedural due process.  Interestingly, the only formal investigation the State Board of Medical Examiners voted to conduct in connection with the Plaintiff, and did conduct after the Plaintiff was constructively dismissed, was to investigate whether or not the Plaintiff was entitled to the annual and sick leave Plaintiff was entitled to receive upon separation from service.

(27)    During the same time period, in August and September 2017, Defendant Shaner sought again to revisit the false notion that the Plaintiff as Executive Director was not Defendant Shaner's boss, that Defendant Shaner was special and only reported to the Board, not the Executive Director, a fabricated theme Defendant Shaner had also worn out with Defendant Shaner's former Executive Director without success.  Defendant Shaner was stubbornly insistent in talking to the Plaintiff in the Plaintiff's office during evaluation meeting, and the Plaintiff told Defendant Shaner over and over in one single conversation that Defendant Shaner did report to the Executive Director.  At one point to press home Plaintiff's point in the presence of Defendant Shaner's stubborn insubordination, the Plaintiff pounded his fist on his desk and said dammit you do report to the Executive Director, not the board, after Defendant Shaner repeatedly continued to exhibit disrespect and insubordination in the presence of Plaintiff. On that one occasion, after finishing her evaluation interview and receiving a 3% raise from the Plaintiff, Defendant Shaner quietly left Plaintiff's office and said Defendant Shaner would agree to work with the new attorney and mentor the new attorney as originally planned; and further stated ,

"After all, we want everyone in the legal division to be happy." These events all transpired within a few weeks of Plaintiff being constructively dismissed.

(28)    Medical Association of Alabama lobbyist, Whitaker, was placed on the State Board of Medical Examiners payroll as an State Board of Medical Examiners employee, but he was, and is, and has always been, a Medical Association of Alabama lobbyist, which employment by State Board of Medical Examiners was prohibited by state law. Also, a state agency can't hire a lobbyist according to the 1995 Executive Order if paid with state funds. When the Plaintiff told Whitaker in July or August 2017 that Plaintiff could not renew Whitaker's employment contract which allowed Whitaker to be on the payroll as a salaried employee in violation of state law, Whitaker became extremely upset. Whitaker had been paid by State Board of Medical Examiners for 10 years as an employee in violation of state law, and Whitaker continued to lobby for the Medical Association of Alabama while being paid by the State Board of Medical Examiners. In 2017, Governor Kay Ivey stated that her new executive order imposed additional standards, and restated the applicability of the earlier 1995 Executive Order which prohibited any state agency from hiring lobbyists. Plaintiff told the State Board of Medical Examiners that it could not keep Whitaker on its payroll. Plaintiff also told the State Board of Medical Examiners that it could not pay lobbyists with state funds. Plaintiff would not sign Whitaker's contract that was coming up for renewal on September 30, 2017, but the State Board of Medical Examiners renewed it after forcing Plaintiff out on September 20, 2017, and re-hired Whitaker, with a new contract that says Defendant Whitaker can do several things but not lobby, which is all he has ever done as a registered lobbyist for the Medical Association of Alabama, all while serving as Deputy Executive Director of the Medical Association of Alabama and Director of Governmental Affairs for the Medical Association of Alabama. All lobbyists

have lobbying contracts, but Whitaker for the past 10 years, had been listed as an employee of State Board of Medical Examiners in violation of the 1995 Executive Order and in violation of Code of Alabama 1975 §36-1-11and is still under contract with the State Board of Medical Examiners, but according to his contract, he is no longer a lobbyist. To circumvent state law, Whitaker's job description at State Board of Medical Examiners referred to such things as overseeing building maintenance.

(29)     Upon information and belief, immediately thereafter, Whitaker set out to have Plaintiff fired and found eager accomplices in the legal division of ABME to further his goal.

(30)     On another occasion, in the spring of 2017, Whitaker did not like the Midwife bill passed by the Alabama Legislature.  As a lobbyist Whitaker worked hard to defeat it, and once it passed, Whitaker misinterpreted the new statute's effect on Certified Nurse Midwives, and was at odds with the Plaintiff's interpretation of the impact on Certified Nurse Midwives.  Whitaker told the Board of Censors, after Plaintiff was asked to appear before the Board of Censors to discuss that issue, that Plaintiff didn't know anything about the medical law (Plaintiff spent 39 years in the Legislative Fiscal Office).  Mark H. LeQuire, MD heard the remarks of Whitaker at the meeting of the Board of Censors, and later told the Plaintiff and others that Whitaker should be fired.  A few days later, the Medical Association of Alabama's own contract lawyer agreed that Plaintiff's interpretation of the new statute's impact on Certified Nurse Midwives was correct, and Whitaker was wrong, further aggravating Whitaker's dislike of the Plaintiff and Whitaker's desire to do whatever was needed to get rid of Plaintiff.   A few weeks before Plaintiff was forced out,  lobbyist Whitaker and lobbyist Niko Corley, were in a two hour meeting with Defendant Shaner and Defendant Hunter behind closed doors in the legal division

of the Board of Medical Examiners and upon information and belief discussed how they could have the Plaintiff removed from his position as Executive Director.

(31)    A week before the now infamous September 20, 2017 board meeting, Plaintiff sent a text to his friend, Mark H. LeQuire, MD, Vice Chairman of the State Board of Medical Examiners to schedule their customary monthly pre-board meeting. The Plaintiff met with Mark H. LeQuire, MD on Wednesday September 13, 2017, and continued their discussion concerning changes to be made about stopping unauthorized reimbursement for travel. Then Mark H. LeQuire, MD quickly changed the subject and said there is something I need to share with you. Mark H. LeQuire, MD said that he received a call from Defendant Shaner and Defendant Hunter about problems in the legal division. Plaintiff told Mark H. LeQuire, MD, "I have no idea what you are talking about." Mark H. LeQuire, MD said they told me you are going around the legal division and you are showing too much favoritism toward the new attorney. Plaintiff immediately informed Mark H. LeQuire, MD that he has just completed an entire office evaluation in August and no one mentioned any problems in the legal division.

(32)    On Thursday September 14, 2017, Mark H. LeQuire, MD had lunch with Defendant Hunter. Later that day Mark H. LeQuire, MD met Plaintiff at the same place they had met the day before. Mark H. LeQuire, MD said I'm afraid Defendant Hunter is going to quit. Defendant Hunter says he can't advance in the office with your favoritism toward the new attorney. Defendant Hunter says the legal division is in shambles, and that Defendant Shaner is going to sue the Plaintiff. When Plaintiff asked Mark H. LeQuire, MD upon what basis Defendant Shaner was going to sue Plaintiff, Mark H. LeQuire MD said he did not know. Plaintiff told Mark H. LeQuire, MD, I'm not going around anyone, I have nothing to do with their case load or case assignments regarding medical issues, and I have absolutely no idea what

they are talking about.  Plaintiff told Mark H. LeQuire, MD, that he would talk to Defendant Shaner and to Defendant Hunter the next morning and find out what is going on.  Mark H. LeQuire, MD also remarked at the meeting that Defendant Shaner has poisoned Defendant Hunter and also said Defendant Hunter told him the Plaintiff had too close of a relationship with the new attorney.  Plaintiff asked Mark H. LeQuire MD if Defendant Hunter was saying the Plaintiff was having an improper relationship, to which Mark H. LeQuire MD said, "one could take it that way." Finally, Mark H. LeQuire, MD said, we need to encourage Defendant Shaner to retire and let Defendant Hunter become General Counsel and put the new attorney in charge of all administrative issues.  Mark H. LeQuire, MD even suggested that perhaps we should have Co-General Counsels, one to head up the hearings and one to handle administrative law issues.  Plaintiff responded by saying that having Co-General Counsels was not necessary, and that Defendant Hunter as promised should be the next General Counsel.

(33)    On Friday September 15, 2017, Plaintiff showed up at the office, and stopped by Defendant Hunter's office and told Defendant Hunter he wanted to see Defendant Hunter in an upstairs meeting room.  After 5 or 10 minutes Defendant Hunter didn't show up.  A short while later, Defendant Shaner and Defendant Hunter showed up together. Plaintiff said, I would like to meet with each of you individually.  Defendant Shaner said, "I'm not coming in your office, and I will never meet with you alone in a room again." Defendant Shaner also would not allow Defendant Hunter to meet alone with Plaintiff so Plaintiff agreed to meet with both of them together in the conference room.  Plaintiff asked, why did you call Mark H. LeQuire, MD about a problem without ever mentioning it to me?  Defendant Hunter yelled in a loud voice, "you are too blind to see." Plaintiff asked, what are you talking about?  If you had a problem, why didn't you come see me? Defendant Hunter repeated yelling "you are too blind to see." Defendant

Hunter was reminded that Plaintiff was his boss and was not to talk to Plaintiff in that tone of voice, Defendant Hunter replied "you don't talk to me in that tone of voice" and further stated , "I don't work for you, I work for the board." Plaintiff responded to Defendant Hunter, as he and the former Executor Director had repeatedly told Defendant Shaner, "you do report to me as Executive Director."   Obviously Defendant Hunter was now taking poisonous cues from Defendant Shaner reflected in Defendant Hunter now patterning her erroneous assertion that Defendant Hunter also answered to no one but the Board.  Plaintiff ended the meeting by telling them he would report this to the Board.  Plaintiff left the meeting without receiving or knowing any explanation of "what too blind to see" was referring to, and without receiving or knowing any complaints Defendant Shaner or Defendant Hunter had against Plaintiff.   At the time Plaintiff did not realize this was part of a fabricated conspiracy Defendant Shaner and Defendant Hunter, along with others, were manufacturing to undermine Plaintiff as Executive Director, which ultimately caused Plaintiff's dismissal based entirely upon false accusations.  However, it will be interesting to hear Defendant Hunter's explanation of why four months later, Defendant Harrison was asked to make, and did make, a motion for the State Board of Medical Examiners to "change" who the lawyers in the legal division reported to, and why the State Board of Medical Examiners had to secretly in January 2018 change Defendant Shaner and Defendant Hunter from being answerable to the Executive Director, and make the lawyers answerable to only the Board, a "boss" which shows up a few hours one day a month!

(34)    After meeting with Defendant Shaner and Defendant Hunter, Plaintiff went back to his office and called Mark H. LeQuire, MD, Vice-Chairman of the State Board of Medical Examiners.  Plaintiff told Mark H. LeQuire, MD that he couldn't run an office with staff lawyers who don't report to me and who insist they only work for the Board which meets once a month.

Mark H. LeQuire, MD said we can't have this insubordination and agreed this kind of behavior warranted both of the lawyers being fired.  Mark H. LeQuire, MD then started talking about a war story about a similar situation that came up at a hospital. Mark H. LeQuire, MD told the Plaintiff you must maintain control in your office.  Plaintiff reminded Mark H. LeQuire, MD that the State Board of Medical Examiners is the only one authorized to dismiss employees, not the Executive Director.   The Plaintiff and Vice-Chairman, Mark H. LeQuire, MD discussed changing the personnel manual so that the Executive Director could dismiss employees. Plaintiff called Mark H. LeQuire, MD later that night and discovered Mark H. LeQuire, MD's attitude had suddenly changed and the conversation ended abruptly.  On Sunday, the Plaintiff had a telephone conversation with the former Executive Director and discovered that Defendant Harrison had become actively involved over the weekend in the events surrounding Defendant Shaner and Defendant Hunter, which Defendant Harrison had no right to do as a private citizen. And Defendant Shaner and Defendant Hunter were completely outside their line and scope of work in discussing such matters with Defendant Harrison.

(35)   On Monday, September 18, 2017, before the upcoming Wednesday September 20, 2017 Board meeting, Plaintiff participated in his customary review of the upcoming agenda with the Board leadership, H. Joseph Falgout, MD and Mark H. LeQuire, MD. At the outset of the meeting, Mark H. Lequire MD looked at H. Joseph Falgout MD, and stated, " I know for a fact that the Plaintiff absolutely did not have an improper relationship."  Which begs the questions, why did Mark H. LeQuire have to correct a false belief held by H. Joseph Falgout MD on that subject, and who communicated that unverified defamatory information to H. Joseph Falgout MD, over the weekend that now had to be corrected by Mark H. LeQuire? And if Chairman Howard Falgout MD believed the September 18, 2017 statement made by his

Vice-Chairman, Mark H. Lequire, MD, why was it discussed among other Board members to such an extent that one or more Board members that same week communicated that rumor to private citizens that the Plaintiff was dismissed for having an affair?  As that Monday meeting was winding down, H. Joseph Falgout, MD and Mark H. LeQuire MD began defending Defendant Hunter.  Plaintiff told them about the meeting with Defendant Shaner and Defendant Hunter on Friday.  Plaintiff asked the board leadership again, how can I be expected to perform my job as Executive Director and run an office with employees who only report to a Board that convenes one day a month?   Plaintiff suddenly realized that Mark H. LeQuire, MD was now back peddling and suggesting that he never said Defendant Shaner and Defendant Hunter should be fired.   Plaintiff told them, if the Board is going to allow the legal division to operate separately from the rest of the office, this is going to create a very inefficient office.  As a followup to the earlier discussion with the Board Vice-Chairman, the Plaintiff had proposed language which would have allowed the Executive Director to dismiss employees in conjunction with the Board.  Plaintiff was now being told by H. Joseph Falgout, MD that the Board would not be willing to grant that change.  H. Joseph Falgout, MD and Mark H. LeQuire, MD told the Plaintiff to find a way to make it work.  Plaintiff left that meeting by telling H. Joseph Falgout, MD and Mark H. LeQuire, MD that Plaintiff would work with the legal division to make it work.

(36)    On Tuesday, September 19, 2017, Plaintiff worked all day with the Credentials Committee on routine work, finished around 6 PM.  Mark H. LeQuire, MD was hosting a fund raiser for Congressman Mike Rogers at Mark H. LeQuire, MD's house.  Plaintiff was invited, when Plaintiff arrived he asked to speak with Mark H. LeQuire, MD when the event was over, Mark H. LeQuire, MD said, let's talk now.  Plaintiff asked his friend, Mark H. LeQuire, MD, what happened between Friday and Monday, why did you stop supporting me, after you agreed

that Defendant Shaner and Defendant Hunter should be fired for their insubordination? Whatever had been communicated to Mark H. LeQuire, MD and H. Joseph Falgout, MD over the weekend had now completely poisoned the relationship they previously had with the Plaintiff.  Nothing got resolved talking with Mark H. LeQuire, MD that night,  then he asked a strange question, "Are you (Plaintiff) going to be able to pay for your new house?  Plaintiff didn't immediately realize the significance of that question, but now realizes that Mark H. LeQuire MD believed the night before the board meeting that Plaintiff was going to be fired, and thus it now appears the Mark H. Lequire MD had over the weekend,  joined forces with the other conspirators to have Plaintiff removed.  Defendant Harrison, then walked in and huddled up with H. Joseph Falgout, MD and Mark H. LeQuire, MD, another occasion of board business being improperly discussed with a private citizen.

(37)    On Wednesday, September 20, 2017, the Department of Public Health held their customary monthly Board meeting, then those same individuals moved to the Medical Association of Alabama building and had their customary monthly Medical Association of Alabama Board of Censors meeting, then the same group walked over to the State Board of Medical Examiners building and had their customary State Board of Medical Examiners Board meeting, all three Board meetings involving the same medical doctors, just wearing different hats.

(38)    As the morning Board of Censors meeting dragged on, Plaintiff learned the Board of Censors of the Medical Association of Alabama had gone into an executive session.  The Board of Censors of the Medical Association of Alabama are a private professional trade group, and therefore have no right to go into executive session concerning the Executive Director of State Board of Medical Examiners, and furthermore they don't employ Plaintiff and have

absolutely nothing to do with Plaintiff, so why did the Board of Censors go into an Executive Session?  Discovery will show the exact false and defamatory information which was circulated and discussed about the Plaintiff at the private non-public meeting of the Board of Censors of the Alabama Medical Association on September 20, 2017.

(39)    Later that same day, the State Board of Medical Examiners routine and uneventful meeting, attended by the Plaintiff, concluded and was adjourned.  Plaintiff was gathering up his files to leave the building, when Chairman, H. Joseph Falgout, MD walked over and said to the Plaintiff, you "may want to stay," we are going into a session, which Plaintiff assumed to mean an executive session.  However, nothing was said during the regular monthly board meeting about going into executive session, which is required under the Alabama Open Meetings Law, and fundamental procedural due process requires notice to the Plaintiff if any hearing involving his employment status was going to be conducted about him.  Plaintiff asked H. Joseph Falgout, MD in disbelief, does the whole Board know what we discussed on Monday about the insubordination of Defendant Shaner and Defendant Hunter?  Plaintiff told H. Joseph Falgout, MD that he would stay as recommended.

(40)    The chairman opened the Executive Session and said, "Norris, I'll let you talk?" Plaintiff replied, "about what?" Defendant Harrison had some written questions apparently prepared for the earlier deliberations at the Board of Censors of the Medical Association of Alabama meeting that morning and started asking those questions. When the Board completed their questioning of the Plaintiff, during which time not one accusation was made against the Plaintiff, the Plaintiff left the meeting.  H. Joseph Falgout, MD told Plaintiff as Plaintiff was leaving the meeting that "nothing was going to happen," a gross misrepresentation based upon the fact that Plaintiff was fired a few minutes later. H. Joseph Falgout, MD then said the board

was going to hear from Defendant Shaner and Defendant Hunter. Plaintiff had all along been asking the Board leadership and no one would tell him, why he was there, and Plaintiff was extremely surprised to learn, after the Plaintiff had gone before the Board, that they now planned to hear from Defendant Shaner and Defendant Hunter, who themselves had refused to tell the Plaintiff when asked, what they were complaining about. Defendant Shaner was off work that day, so they interviewed Defendant Shaner by conference call, and interviewed Defendant Hunter. In other words, the Board asks Plaintiff to come to the meeting, made no accusations, asked the Plaintiff to speak, then after Plaintiff leaves, interviewed two members of the legal staff without ever allowing the Plaintiff to know what Defendant Shaner and Defendant Hunter planned to say, or did say. Plaintiff hung around until 7:30 PM but was not allowed to hear what Defendant Shaner and Defendant Hunter told the board and there are no official minutes of those deliberations yet published. After that meeting concluded H. Joseph Falgout, MD and Mark H. LeQuire, MD came to Plaintiff's office with heads bowed, and told Plaintiff the Board wants you to resign, the Board will offer you three months severance pay if you will sign a non-disclosure agreement. Plaintiff said, if you are going to do that, why not make it 12 months severance. H. Joseph Falgout MD and Mark H. LeQuire, MD said, we aren't authorized to do that. Plaintiff then asked "what if I choose not to resign and not accept your offer?" H. Joseph Falgout MD and Mark H. LeQuire, MD said the Board had voted to fire you "for cause if you don't resign." Plaintiff asked again, what cause, and why am I being asked to resign? H. Joseph Falgout, MD and Mark H. LeQuire, MD said, because of the toxic work environment and because Defendant Shaner told the Board she is afraid for her safety. Plaintiff, at that moment in total disbelief asked them, what was the vote? Howard Falqout, MD said, "don't go there."

(41)     Plaintiff later found out a board member initially asked the Board secretary to come up to the executive session to record the meeting as required by law, but a short while later notified the Board secretary the board did not need her, one of many violations of the Open Meetings Act that day.  H. Joseph Falgout, MD when asked by Plaintiff if there were minutes of the meeting, said he would prepare the minutes over the weekend, but that was September 20, 2017, and as far as known to the Plaintiff, no minutes were ever prepared.  It's important to mention that an State Board of Medical Examiners executive session can't take action, they can only report to a conducted meeting of the State Board of Medical Examiners Board, and that Board has to officially go back into session to dismiss an employee, which was never done, so the representation to the Plaintiff that the Board had voted to dismiss the Plaintiff for cause was a false representation upon which the Plaintiff relied when he resigned under duress.  Plaintiff asked H. Joseph Falgout, MD and Mark H. LeQuire, MD if he could go home and talk with his wife, and let them know his decision the next day.  They both agreed.

(42)     In the meantime Plaintiff talked to someone who helped him draft a letter resigning "under duress."  He presented the letter to the office manager the next morning, Thursday, September 21, 2017.   Plaintiff asked about accumulated leave pay. The office manager said, we'll process yours just like we did the former Executive Director.  Plaintiff began cleaning out his office and when Plaintiff finished he stopped by the office manager's office on his way out to say goodbye. He found Defendant Hunter berating the office manager and admonishing the office manager, telling her, "What you did is illegal" in a loud enough voice others in the office overheard his egregious behavior. The office manager was in tears, and extremely upset. Moments later Defendant Hunter tried to provoke a fight with the Plaintiff, placing his nose in Plaintiff' face, but Plaintiff wouldn't participate in the immature antics of

Defendant Hunter.  Defendant Hunter next illegally demanded dismissed employee Plaintiff to empty his pockets.  Plaintiff told Defendant Hunter, "I've resigned, and no longer work here." Apparently Defendant Hunter thought Plaintiff had a State Board of Medical Examiners leave check in his pocket.  Next, Defendant Hunter ran down the hallway and tried to get one of the investigators to remove Plaintiff from the building.   Defendant Hunter "ordered" the investigator, to remove Plaintiff from the building.  The investigator, a friend of Plaintiff, asked Plaintiff if he would agree to be escorted out the building to appease Defendant Hunter, and thus the egregious behavior of Defendant Hunter was momentarily curtailed.  A short time later, the same office manager and the interim Executive Director filed employee complaints against Defendant Hunter for his egregious behavior which the State Board of Medical Examiners not only ignored but reacted by promoting Defendant Hunter to General Counsel.  At no time were any of those egregious complaints investigated or referred to outside counsel, however, after the Plaintiff's constructive dismissal, the Board members of ABME authorized a formal investigation to determine if the Plaintiff received appropriate leave paid upon his termination, and formally referred the investigation to outside counsel.

(43)    Earlier that day Defendant Harrison called an investigator and tried to persuade the investigator to tell Defendant Harrison that Plaintiff wasn't accessible to the investigators in order to do their work.   The investigator told Defendant Harrison that Plaintiff was very accessible.  Notice the irony, Defendant Shaner and Defendant Hunter falsely alleged Plaintiff was too involved in the legal division and was working around the legal division, and now Defendant  Harrison is found, on the day Plaintiff was constructively dismissed, trying to dig up evidence that Plaintiff wasn't involved enough.

(44)    Upon termination of the Plaintiff, the State Board of Medical Examiners suddenly found themselves in need of someone to sign the Medical Association of Alabama contracts Plaintiff had not signed by the time he was forced out.  To their surprise, the interim Executive Director they hired, refused to sign the contracts, so shortly thereafter the interim Executive Director promptly retired after an investigation was launched against him.  The Chairman of the State Board of Medical Examiners ended up signing the contracts without having legal authority to do so.

(45)    In the meantime, fearing there had been insufficient cause to remove the Plaintiff, Defendant Harrison began contacting other staff members trying to justify to them why the Plaintiff had to be dismissed, but those contacts occurred after the dismissal.

(46)    The Plaintiff was never provided with any specific information concerning the accusations being made against him, the Plaintiff was never given a pre-termination hearing, the Plaintiff was never allowed to confront his accusers, the Plaintiff was never given any notice that the State Board of Medical Examiners on September 20, 2017 was going to interview employees, and discuss Plaintiff's dismissal.  There was a complete denial of fundamental procedural due process toward the Plaintiff.  Only after the non-noticed hearing conducted by the Board of Censors of the Medical Association of Alabama and the non-noticed hearing of the State Board of Medical Examiners, both illegally dealing with the dismissal of the Plaintiff, was the Plaintiff told why he was being dismissed, namely, a fabricated claim of a toxic work environment and a fabricated and false statement that Defendant Shaner feared for her safety.

(47)    All of the foregoing statements are incorporated by reference in each of the causes of action set forth below.

## I

## CAUSE OF ACTION
## BREACH OF IMPLIED CONTRACT

(1)     The Alabama Supreme Court long ago set out three requirements which a plaintiff-employee must prove in order to establish a contract for a definite term.  Those same three requirements are present in this case, namely (1) there was a clear and unequivocal offer of employment for a definite term, (2) that the hiring agent had the authority to bind the principal to employment for a definite term, and (3) the employee provided substantial consideration for the contract separate from the services to be performed. Hoffman-La Roche, Inc. v. Campbell, 512 So. 2d 725 (Ala. 1987), Birmingham -Jefferson County Transit Authority vs. Arvan, 669 So 2d 825 (Ala. 1995).  The above cases also recognizes the general rule that every contract implies an obligation of good faith and fair dealing, none of which was practiced by the Defendants in this case.

(2)     In January 2015, the former Executive Director of the State Board of Medical Examiners extended a specific offer to the Plaintiff to leave his job as Director of the Legislative Fiscal Office where he had been employed for the past 39 years, and accept a new job as Associate Executive Director of the State Board of Medical Examiners for four (4) years. During the prior 32 year history of the State Board of Medical Examiners, the Executive Director had the full support, authority, and consent of the Credentials Committee of the Board of Medical Examiners, and the full support and consent of the Board of Medical Examiners to hire employees and dismiss employees at his discretion.  The minimum four (4) year duration of Plaintiff's employment and his salary were specifically communicated by the former Executive Director and agreed upon by the Plaintiff, with the consent of the Credentials Committee.

(3)      The Plaintiff provided significant consideration for his new position as Associate Executive Director.  For most of its modern history, the State Board of Medical Examiners had a well known State Senator serving as it's Executive Director with years of experience in legislative matters, was well known throughout political circles in Montgomery, and had extensive contacts with people in important political and business positions throughout the state which was of great benefit to the State Board of Medical Examiners.  In January 2015, the Plaintiff had worked in state government for the previous 39 years, worked exclusively with the Alabama State Legislature, worked closely with State Senators and State Representatives on both sides of the political aisle, and had equally comparable legislative skills which were acknowledged by the retiring Executive Director.  The Plaintiff already held a high paying position as Director of the Legislative Fiscal Office with substantial retirement benefits, and the position was one Plaintiff could have held indefinitely for years to come, with each passing year increasing his retirement benefits and leaving Plaintiff in a position to potentially receive annual raises.  All of these benefits were surrendered by the Plaintiff when he was recruited and hired by the State Board of Medical Examiners.

(4)      Between July 2015 and the end of December 2016, the Plaintiff, as Associate Executive Director, while working with the former Executive Director and with the Office Manager of the State Board of Medical Examiners began to identify expenditures by the State Board of Medical Examiners that were not in compliance with statutory, regulatory, and ethical authority.  By the time the Plaintiff was elected Executive Director in January 2017, the Plaintiff was well on his way toward implementing some of the necessary changes required by various statutory and regulatory authorities governing the work of the State Board of Medical Examiners.  Unknown to the Plaintiff, Defendant Harrison, in concert with Alabama Medical

Association lobbyist, Whitaker, who both opposed certain changes in expenditures by the State Board of Medical Examiners, and eventually in further concert with Alabama Board of Medical Examiner' staff attorneys, Defendant Shaner and Defendant Hunter, all became actively engaged in what culminated in a malicious and fabricated ploy to present to the State Board of Medical Examiners enough fabricated evidence to have the Plaintiff dismissed with the help of a majority of complicit Board members, and did thereby constructively remove the Plaintiff from his new position as Executive Director on September 20, 2017, twenty-one months before his four year contract was completed.

(6)     The State Board of Medical Examiners grossly and maliciously breached the contract of the Plaintiff, failed to follow its required procedures for dismissal, engaged in a surreptitiously and procedurally flawed effort to force the Plaintiff to resign without providing the plaintiff with a trifling of required procedural due process; failed to conduct any basic investigation, notwithstanding all of the intentional and negligently errant conduct perpetrated by the State Board of Medical Examiners at a time when they were prohibited from dismissing a contract employee for a totally fabricated cause as was done in this instance.

(7)     The Plaintiff therefore moves this Court to find that Plaintiff had a four year contract with the Alabama Board of Medical Examiner that runs from July 1, 2015 until July 1, 2019, and due to the acts of the named Defendant Board members and, individually and collectively, the contract was breached without just cause, and the Plaintiff was dismissed without sufficient cause,  with the amount of damages to be determined by the Court and/or, if necessary, to be awarded by the Alabama Board of Adjustment. Matthews v. Alabama A&M University, 716 So. 2d 1272 (Ala. Civ Appeals1998).

## II
## CAUSE OF ACTION
## TORTUOUS INTERFERENCE WITH
## EMPLOYMENT RELATIONSHIP

Over the past ten months different variations of the fabricated and false accusations against the Plaintiff have emerged from different sources not disclosed to the Plaintiff until immediately before and after he was constructively dismissed.  Below is a compilation of the fabricated accusations.

### (A)  DEFENDANT SHANER AND DEFENDANT HUNTER
### FALSE CLAIMS OF A TOXIC ENVIRONMENT
### OR LEGAL DIVISION IN SHAMBLES

There was never any toxic work environment in the legal division, only insubordinate employees who the State Board of Medical Examiners refused to discipline.  At all times material to this civil action, the legal division consisted of three lawyers, only two of which perpetrated (1) a gross insubordination, (2) refused to report to the Plaintiff as Executive Director, (3) refused to abide by instructions from the Executive Director, (4) refused to answer any questions or explain their fabricated grievances to the Executive Director, (5) choosing instead to meet secretly with members of the State Board of Medical Examiners and (6) with one or more private citizens who had no involvement with the employment of the Executive Director, thereby violating the Plaintiff's rights by making slanderous and defamatory comments to private citizens and grossly interfering with the Plaintiff's contract of employment.   Whatever working environment

existed in the legal division about which they found objectionable was totally created and fabricated by the actions of Defendant Shaner and Defendant Hunter, who saw an opportunity to maliciously fabricate reasons to justify the removal of the Plaintiff as Executive Director, and actively seized upon that opportunity. Defendant Shaner and Defendant Hunter held a lengthy closed door meeting with Defendant Whitaker and another lobbyist for the Medical Association of Alabama, less than two weeks before Plaintiff was dismissed. It will be shown through discovery that the sole purpose of that meeting was to embellish the fabrications in furtherance of the conspiracy to remove the Plaintiff.  Lobbyists for the Medical Association of Alabama have absolutely no authority, right, or privilege to engage in discussions with the legal staff of the State Board of Medical Examiners to advance a plan to get rid of the Plaintiff, and it's completely outside the line and scope of members of the legal staff to consult with and conspire with lobbyists for the Medical Association of Alabama concerning the dismissal of the Executive Director of the State Board of Medical Examiners.  Defendant Shaner's and Defendant Hunter's meetings and telephone calls to one or more Board members during September 2017 leading up to and including September 20, 2017, were by themselves, without regard to substance, annoying to and lazily regarded by Board members as evidence the legal division was in shambles.  In other words, the constant fabricated complaints originating from the these two members of the legal division and communicated to one or more Board members were ill-advisedly regarded, by certain Board members who

were unwilling to investigate or question their motives, that the legal division was in shambles.

### (B)  DEFENDANT SHANER AND DEFENDANT HUNTER FALSE CLAIM THAT PLAINTIFF WORKED AROUND THE LEGAL DIVISION

At no time during the August 2017 employee evaluations or during employee interviews in August 2017 did any employee in the legal division voice any complaint or make any suggestion that the Plaintiff was working around the legal division, in fact, Defendant Hunter thanked the Plaintiff for staying out of the business of the legal division.  There is no evidence that the Plaintiff, as Executive Director, worked around the legal division, absolutely none. Once again Defendant Shaner and Defendant Hunter totally fabricated such allegations and reported those to Board members which were used by Defendant Harrison and other complicit Board members to build a fabricated case to dismiss the Plaintiff as Executive Director.

### (C)  DEFENDANT SHANER AND/OR DEFENDANT HUNTER FALSE CLAIM THAT PLAINTIFF ENGAGED IN AN IMPROPER RELATIONSHIP WITH A STAFF MEMBER

This is the most defamatory, slanderous, and malicious lie spread by Defendant Shaner and/or Defendant Hunter, and passed along by certain members of the Board who conducted no formal investigation to learn the truth, because in the minds of a majority of the members of the State Board of Medical Examiners,

truth had become an inconvenient obstacle that was interfering with the efforts by certain members of the Board of Medical Examiners to get rid of the Plaintiff so those same Board members could promptly return to their previously unchallenged, unfettered and free cash flowing spending practices which in the past had provided certain Board members in excess of $85,000.00 per year in extra cash benefits.

### (D)  DEFENDANT SHANER
### FALSE CLAIM THAT DEFENDANT SHANER
### FEARED FOR HER SAFETY IN THE PRESENCE OF THE PLAINTIFF

It appears Defendant Shaner decided she needed something more sensational when she was confronted about her fabricated lies about the Plaintiff having an improper relationship with a staff member, so she fabricated another lie claiming she feared for her safety in the presence of the Plaintiff.  She appears to have thought to herself, in  consultation with others, that more justification was needed, so two weeks after leaving the Plaintiff's office and two weeks after receiving a 3% salary raise from the Plaintiff, she starts broadcasting that she fears for her safety which became one of the two reasons verbally provided to the Plaintiff the day he was constructively dismissed.  Oddly, only a week or two earlier, Defendant Shaner said these words as she left Plaintiff's office, "After all, we want everyone in the legal division to be happy"

### (E)  DEFENDANT SHANER'S
### FALSE AND MISLEADING CLAIM THAT A LAWSUIT
### AGAINST THE STATE BOARD OF MEDICAL EXAMINERS
### OR THE PLAINTIFF WAS FORTHCOMING

(1)  This was a typical pattern and practice exhibited by Defendant Shaner who over time realized that some Board members would do anything to avoid a lawsuit, so she communicated through herself and other Defendants that a lawsuit would be filed against the ABME or the Plaintiff.  At no time was the Plaintiff informed of these false and baseless allegations, yet when the members of the State Board of Medical Examiners gathered throughout the day on September 20, 2017, this was one of the primary reasons they used to terminate the Plaintiff to avoid Defendant Shaner's fabricated lawsuits without the Plaintiff knowing upon what basis a lawsuit was going to be filed, and without communicating knowledge of the threat to the Plaintiff at the time he was constructively dismissed.  The board apparently chose to believe Defendant Shaner, without any evidence of her false claims, without conducting any investigation of her false claims, and without talking to any corroborating witnesses, preferring instead to trample the procedural due process rights of the Plaintiff and remove Plaintiff while retaining Defendant Shaner, who could have done something about the financial abuses within the State Board of Medical Examiners identified later by the Plaintiff, but did not find any problems with the issues uncovered by the Plaintiff, in the 25 years Defendant Shaner was employed in the legal division.

(2)     At all times during August and September 2017, the Plaintiff had a protectable employment relationship of which the ABME Board and Defendant Shaner and Defendant Hunter knew.  At all times during August and September 2017, while engaged in their individual and conspiratorial actions, the Defendant Shaner and Defendant Hunter were talking to legal

strangers about the Plaintiff, and while doing so the Defendant Shaner and Defendant Hunter maliciously and falsely interfered with Plaintiff's employment contract without valid justification, and their actions, combined with the actions of other Defendants were the direct and proximate cause of Plaintiff's constructive dismissal, thereby causing Plaintiff severe damage.

(3)    Plaintiff therefore demands compensatory and punitive damages against all the previously named members of the State Board of Medical Examiners who jointly and severally discussed, spread, broadcasted, and perpetrated the false and malicious allegations about the Plaintiff, and who wantonly and maliciously, individually and conspiratorially, engaging in actions, efforts, and communications that intentionally and tortuously interfered with Plaintiff's employment as Executive Director, information at the time the originators and public disseminators knew or should have known were false, and who had reason to know would be disseminated verbally and in writing without any investigation having been conducted, and in so doing, such false, slanderous and defamatory statements, were disseminated before and among members of the State Board of Medical Examiners, were also disseminated before the Board of Censors of the Medical Association of Alabama involving more private citizens, when absolutely none of such false information should have been disseminated in the presence of people who were not entitled to be recipients of any information about the Plaintiff, which false information, intentionally and tortuously, interfered with Plaintiff's employment as Executive Director causing his constructive dismissal for which Plaintiff demands judgment for $1,500,000.00 compensatory damages and $8,500,000.00 punitive damages, plus court costs.

## III
## CAUSE OF ACTION
## VIOLATION OF PRIVACY

(1)      The Medical Association of Alabama is a private trade organization having absolutely nothing to do with the Plaintiff or the Plaintiff's employment, yet on the morning of September 20, 2017, MASA's duly constituted Board of Censors, engaged in a gross violation of the Plaintiff's privacy by discussing and deliberating false statements about the Plaintiff, some rising to the level of defamation, but all involved giving publicity to matters concerning the Plaintiff that placed the Plaintiff before the public in a false light and thereby invaded Plaintiff's privacy because (a) the false and fabricated light in which the Plaintiff was placed was highly offensive to a reasonable person, and (b) the members of the Board of Censors, including staff members of the Medical Association of Alabama, and at least one private individual, had knowledge of the truth and/or acted in reckless and intentional disregard as to the falsity of the publicized matters and the false light in which the Plaintiff was placed.  All members of the Board of Censors of the Medical Association were acting outside the line and scope of their duties, during the commission of the acts set forth herein, including those staff members of the Medical Association of Alabama, and at least one private individual, over which they had no involvement in the employment of the Plaintiff.  As a result of the actions of the members of the Board of Censors of the Medical Association of Alabama, and one or more staff members of the Medical Association of Alabama, the Plaintiff suffered ridicule, embarrassment, shame, and humiliation and was dismissed from his position as Executive Director of the State Board of Medical Examiners.  Hoover v. Tuttle, 611 So. 2d 290 (Ala. 1992).

Wherefore the Plaintiff demands judgment against Medical Association of Alabama, and those board members and former boards members previously named in this complaint, for

compensatory damages in the amount of $1,500,000.00 and punitive damages in the amount of $8,500,000.00 plus costs.

## IV
## CAUSE OF ACTION
## UNDER 42 USC 1983
## VIOLATION OF PROCEDURAL DUE PROCESS

The Plaintiff has no adequate remedy pursuant to state law to remedy the violations of his procedural due process rights guaranteed under the U. S. Constitution for the violations committed under color of state law by the State Board of Medical Examiners and by each previously named individual member of the State Board of Medical Examiners, for violating the following constitutional rights of the Plaintiff.  The Plaintiff seeks injunctive relief, punitive damages and attorneys fees which are not available under state law.

(1)     The Plaintiff was never given any specific or formal notice of the charges or accusations being made against him until after the Plaintiff was notified of his dismissal.

(2)     The Plaintiff was never provided with the rules and policies governing the manner in which an Executive Director could be dismissed.

(3)     The Plaintiff was never told who was going to present false claims against him at a board meeting, and was misled by Board members about the impact those false claims could have on Plaintiff's continued employment.  It was grossly misleading for the Plaintiff to be told by H. Joseph Falgout, MD on the night of September 20, 2017, that nothing was going to happen, only to be told minutes later by the same H. Joseph Falgout, MD that Defendants voted to dismiss the Plaintiff, thereby misleading the Plaintiff concerning the need to defend himself hire counsel, and present truthful evidence and truthful witnesses until it was too late.

(4)     The Plaintiff was never provided with any procedural timetable for how false accusations would be handled by the State Board of Medical Examiners and was never provided with any notice of any step of the process adopted by the State Board of Medical Examiners to deal with any allegations against the Plaintiff.

(5)     The Plaintiff was not given any opportunity to be confronted with accusations against Plaintiff or be allowed to present evidence on Plaintiff's behalf.

(6)     The ABME Board of violated the right of the Plaintiff to present Plaintiff's own evidence; and to cross examine and question the false statements eagerly entertained by certain board members and staff employees, and the right of the Plaintiff to confront the accusers, and to be provided some forum in which to address the absence of fundamental due process.

(7)     The ABME Board engaged in grossly deceptive behavior by suggesting the Plaintiff appear at their illegally called executive session, and when Plaintiff appeared, was told, "we will let you talk" without any explanation of why Plaintiff was asked to attend the illegally called meeting..

(8)     More seriously, the evidence will show the ABME Board never intended to provide the Plaintiff with any procedural due process and are therefore guilty of an grossly intentional violation of Plaintiff's constitutional right to procedure due process.  A majority of the members of the State Board of Medical Examiners had already agreed, reached a consensus, or decided earlier that morning in a private off-the-record meeting of the Board of Censors to terminate the Plaintiff without any minimal procedural due process afforded to the Plaintiff.

(9)     There were serious implications and potential repercussion as a result of the false allegations discussed by the ABME Board on September 20, 2017, and a no time was the

Plaintiff advised of the allegations and the Plaintiff was never allowed to be to accompanied by a representative or advised of his right to legal counsel.

(10)   The ABME Board completely failed to provide the Plaintiff with a fair and impartial fact-finding investigation, and completely failed to provide a fair and impartial hearing and failed to provide any type of pre-termination hearing.

(11)   The ABME Board  further violated Plaintiff's right to procedural due process by conducting an executive session that was capricious, unreasonable and arbitrary in substance and procedure.

(12)   The Plaintiff was never provided with a written decision of the findings against the Plaintiff or a written statements of the reasons for his dismissal,

(13)   The Plaintiff was treated arbitrarily and inconsistent with the treatment given to other dismissed employees.

(14)   The Plaintiff's right of privacy was violated when false accusations were repeated by certain members of the ABME Board  to the general public.

(15)   The ABME Board  never ordered any type of investigation to determine the truth and veracity of those seeking the Plaintiff's dismissal.

Plaintiff asks the Court for the following relief:

(A).   A judgement under 42 U.S.C. § 1983 awarding damages against The State Board of Medical Examiners in the amount of $1,500,000 compensatory damages and $8,500,000 in punitive damages, and a judgment against each previously named Board Member, and previously named former Board members, who supported and/or acquiesced in the violation of Plaintiff's rights to procedural due process in the amount of $250,000.00 per Board member plus punitive damages of $200,000.00 per Board member.

(B).     A judgment under 42 U.S.C. § 1988 and under all other applicable laws against

The State Board of Medical Examiners and each named Board Member for attorney's fees, costs,

witness fees, and expenses, including and any other legal or equitable relief which the Court

deems just and proper to award.

**V**
**CAUSE OF ACTION**
**DECLARATORY AND INJUNCTIVE RELIEF AGAINST**
**State Board of Medical Examiners**

(1)   The Plaintiff asks the Court to declare the interpretation of Governor Fob James

Executive Order #1, January 18, 1995, and Governor Kay Ivey, Executive Order #706, July 13,

2017, and enjoin the State Board of Medical Examiners from continuing the practice of

employing and/or hiring lobbyists or pseudo lobbyists in violation of the law, so that future

Executive Directors won't have to risk his/her job status by confronting Board members with the

illegal practices.

(2)   The Plaintiff asks the Court to declare the interpretation of Code of Alabama 1975

§36-1-11 and (a) enjoin the State Board of Medical Examiners from continuing the practice of

doing business with the Medical Association of Alabama as long as the State Board of Medical

Examiners continues to hire employees of the Medical Association of Alabama, and (b) enjoin

the State Board of Medical Examiners from hiring lobbyists with the understanding they are

hired to do anything but lobby, so that future Executive Directors won't have to risk his/her job

status by confronting Board members with illegal practices.

(3)   The Plaintiff asks the Court to declare the interpretation of Code of Alabama

§34-24-54 and enjoin the State Board of Medical Examiners from paying $300 per hour to its

members for speaking at CME events, enjoin the State Board of Medical Examiners from

allowing its Board members to receive up to $10,000.00 per year for travel expenses and fees for attendance at events to earn their CME hours, and to require the State Board of Medical Examiners to only pay the statutory allowed $300 per diem attendance fees for official functions of the State Board of Medical Examiners, so that future Executive Directors won't have to risk his/her job status by confronting Board members with illegal practices.

(4)     The Plaintiff asks the Court to declare the interpretation of Code of Alabama §36-25-1 et seq. and require the State Board of Medical Examiners to operate subject to the Alabama Ethics Commission.

(5)     The Plaintiff asks the Court to declare the interpretation of Section 43 of the Constitution of Alabama and Amendment 5 Article III of the Alabama Constitution and find that Code of Alabama §34-24-53 is unconstitutional thereby requiring the dissolution of the current arrangement which allows the private non-public Alabama Medical Association to independently decide who serves on the State Board of Medical Examiners contrary to the separation of powers doctrine, so that the State Board of Medical Examiners can be constitutionally organized and operated within the laws of the State of Alabama.

(6)     And to award Plaintiff a Judgment for attorney fees attorney's fees, costs, witness fees, and expenses, including and any other legal or equitable relief which the Court deems just and proper to award in prosecuting the foregoing equitable relief.

# DEMAND FOR A JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury of all causes of action and requests for relief demanded in this civil action..

Dated this 7th day of September, 2018.

/s/  B. Kincey Green Jr.  GRE040
Attorney for Plaintiff

B. Kincey Green Jr.
Reeves & Stewart PC
PO Box 447
Selma, Alabama 36702-0447
Office 334-875-7236
Email kincey@bellsouth.net

CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that a copy of the Amended Complaint has been served upon all parties to this civil action by serving each of their attorneys appearing in this civil action and listed below through the CM/ECF court system.

Barbara C. Wells (HIL045)
C. Richard Hill (GIL037)
Ashley H. Freeman
CAPELL & HOWARD
150 South Perry Street
Montgomery, Alabama 36104

Tabor R. Novak, Jr (NOV001)
Miland Fredrick Simpler, III
BALL BALL MATTHEWS & NOVAK, PA
445 Dexter Avenue Suite 9045
Montgomery, Alabama 36104

Marc James Ayers (ASB-7731-A60M)
Davis S. Vaughan
BRADLEY ARANT ROSE & WHITE
One Federal Place
1819 5th Avenue
Birmingham, Alabama 35203

Arnold W. Umbach, III (UMB002)
Walter W. Bates (BAT007)
Madelines Greskovich (GRE147)
STARNES DAVIS FLORIE LLP
100 Brookwood Place #7
Birmingham, Alabama 35203

Brandon K. Essig (ESS001)
Logan T. Mathews (MAT068)
LIGHTFOOT FRANKLIN & WHITE llc
400 20TH Street North
Birmingham, Alabama 35203

Robert D. Segall (SEG003)
COPELAND FRANCO
P. O. Box 347
Montgomery, Alabama 36101-0347

Done this 7th day of September, 2018.

/s/ B. Kincey Green Jr.  (GRE040)
Attorney for Plaintiff

B. Kincey Green Jr.
REEVES & STEWART PC
P. O. Box 447
Selma, Alabama 36702-0447
Telephone 334-875-7236
kincey@bellsouth.net